UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Z & A INFOTEK CORP., d/b/a ZEN & ART, INC.,

Plaintiff,

-against-

OPTIMUM COMMUNICATIONS, INC., f/d/b/a ALTICE USA, and CSC HOLDINGS, LLC,

Defendants.

**1:26-cv-06891**

**COMPLAINT**

Plaintiff Z & A Infotek Corp. d/b/a Zen & Art, Inc., ("Plaintiff" or "Z & A"), through its undersigned counsel, brings this Complaint against Defendants Optimum Communications, Inc. (formerly known as Altice USA) and CSC Holdings, LLC ("CSC Holdings") (collectively, "Defendants") and alleges as follows:

## NATURE OF THE ACTION

1. On or about July 2023, Hernani Vaz Attunes, a leading member of Winprovit - Solucoes Inteligentes S.A. ("Winprovit"), a technology consulting and workforce provisioning company, was arrested by Portuguese authorities in connection with a procurement corruption scandal involving key executives at Altice Europe, N.V.

2. Although the fraud investigation is ongoing, prosecutors allege that Winprovit and Altice Europe, engaged in bid-rigging and used dummy corporations and other intermediaries to over-charge Altice for technical goods and services, and divert monies back to conspirators at the respective companies.

3. In the wake of the investigation, procurement officers at Altice/Portugal and the United States subsidiary Altice USA stepped down, and Altice USA launched its own internal investigation to identify vendors and executives who may have participated in the fraudulent rigging of the procurement process. Altice reportedly severed ties with approximately sixty suppliers and vendors.

4. Z & A was a Department of Defense vetted and preferred vendor of Altice USA since 2022. Z & A was never the subject of any investigation and was never alleged to have knowledge of, or participated in, the alleged conspiracy between Altice and Winprovit.

5. Nevertheless, without legal justification, Altice USA used the scandal as an excuse to breach existing contracts with Z & A and distance itself from fraudulent promises it made that Z & A would be awarded lucrative contracts if it agreed to operate at negative profit margins on other contracts. At the same time, Altice USA disavowed and refused to execute contracts that had been fully negotiated and formalized and based on which Z & A had already expended considerable resources.

## THE PARTIES AND RELATED ENTITIES

6. Plaintiff Z & A is a minority owned New Jersey corporation with its principal place of business at 160 Littleton Road, Third Floor, Suite 300, Parsippany, NJ 07054.

7. Defendant Optimum Communications, Inc. is a Delaware corporation with a principal executive office at 1 Court Square West, Long Island City, New York. Prior to November 7, 2025, Optimum Communications operated under the name Altice USA. To avoid confusion, and consistent with relevant documents in the case, Optimum Communications will be referred to herein as “Altice” or “Altice USA.”

8. Defendant CSC Holdings is a wholly owned operating subsidiary of Optimum Communications and is a Delaware limited liability corporation. Its principal executive offices are located at 1111 Stewart Avenue in Bethpage, New York. Corporate boundaries between CSC Holdings and Altice USA were routinely disregarded. For example, CSC Holdings routinely executed Work Orders and other contracts on behalf of Altice and, as alleged herein, CSC Holdings was expressly defined in Work Orders and Statements of Work as synonymous with "Altice" and "Altice USA."

9. Cablevision Systems Corporation ("Cablevision") is the sole direct owner and member holding all outstanding membership interests in CSC Holdings. Cablevision is a Delaware corporation and has its principal place of business in Bethpage, New York.

## JURISDICTION AND VENUE

10. The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 (a) because there is complete diversity jurisdiction between Plaintiff and Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

11. The Court has original jurisdiction over this matter because the issues raised by Plaintiff relate to products and services used in interstate and international commerce.

12. The Court has personal jurisdiction over Defendants pursuant to CPLR 302 (a)(1) because defendants maintain offices in Nassau County and transact business within the State.

13. Venue in this District is proper pursuant to 28 U.S.C. 1391 (b)(1) because the Eastern District of New York is the judicial district in which Defendants maintain their offices.

## FACTUAL ALLEGATIONS

**A. The Cisco Contract**

14. Z & A provides comprehensive systems integration, information technology architecture, software implementation and upgrades, as well as management consulting services to maximize enterprise performance for the public and commercial sectors. Z & A's clients include substantial financial, insurance and telecommunications companies.

15. On or about April 7, 2022 CSC Holdings and Z & A entered into a written Master Consulting Agreement pursuant to which Z & A was approved to provide consulting services as detailed in Statements of Work approved by CSC Holdings/Altice on a project-by-project basis.

16. The Master Consulting Agreement, Section 2, provided that it remained in full force and effect for a period of two (2) years and would continue thereafter for additional periods of one (1) year unless terminated by either party by giving written notice not less than thirty (30) days prior to the date on which the Agreement would otherwise renew.

17. The Master Consulting Agreement was never terminated by either party, and continued to renew in accordance with its terms.

18. On or about January 27, 2023, Z & A delivered a Statement of Work setting forth the terms and conditions under which Z & A would provide certain network licensing and support services to CSC Holdings (defined in the Statement of Work as "Altice USA"). The Statement of Work included upgrades, maintenance and support of various CISCO network systems from January 2024 through December 2025, with staged payments to be made to Z & A totaling $6,014, 816.08.

19. After internal discussion and review by Danny Holton, Altice SVP – Telecom and Application Development, John Rollo, Altice Director of Business Operations, Brent Nielson, Altice Vice-President Procurement, and Gregory Greiner, the Statement of Work was modified

and redlined. Altice's modest changes included adding a preamble to the Statement of Work and signature lines for Sandesh Shetty, Z & A's CEO, and Dannis Mathew, CEO, on behalf of CSC Holdings.

20. On or about March 1, 2023, the final version of the Statement of Work was approved by Altice USA.

21. By email dated April 6, 2023, Brent Nielson of Altice stated to Sandesh Shetty, CEO of Z & A, that "We currently have 3 deals in process" and informed Z & A that:

> Cisco (Danny/John) - $6M – We issued PO [Purchase Order] 992492 on 3/20. We attached the agreement and Roberto [Martinez] requested we issue the PO with the unsigned quote [i.e., the Statement of Work] agreement attached – as our agreement. Is this o.k. with you?"

22. On April 6, 2023, Sandesh Shetty replied by email "Thanks Brent for your response and the timelines provided . . . . . As far as Cisco contract is concerned, we are fine with the PO."

23. Purchase Order 992492 was issued on March 30, 2023 and was acknowledged and accepted by Jill Bellino on behalf of CSC Holdings, using an Altice USA email address, and by Dorothy Roberts on behalf of Z & A. On March 30, 2023, Z & A received the signed Purchase Order and attached Statement of Work and thanked Brent Nielson at Altice USA for "the signed SOW [Statement of Work]"

24. The Purchase Order, together with the Statement of Work attached, constituted a binding contract between the parties with respect to the work and services to be conducted by Z & A and its chosen subcontractors through December 2025.

**Z & A's Performance of the Cisco Statement of Work**

25. Pursuant to the contract, Altice USA procurement understood that Z & A would act as, among other things, a value-added reseller ("VAR") to integrate and enhance third-party

software and services and re-sell it as a ready-to-use solution and provide a single point of contact to streamline installation and technical support. At the request of Altice and CISCO, Z & A supervised Original Equipment Manufacturers ("OEM's") which supplied the necessary software licenses for the project, and which were regarded as Z & A's subcontractors.

26. Accordingly, Z & A had overall responsibility for executing the Statement of Work and overseeing the project through its relationship with its subcontractors. The OEM's utilized by Z & A for the CISCO project were Aceyus, Inc. ("Aceyus") and Upstream Works Software ("Upstream Works").

27. From January 1, 2023 to December 31, 2025 Z & A, together with Aceyus and Upstream Works, performed services in accordance with the Statement of Work, without any complaint from Altice.

**Automatic Renewal of the Cisco Statement of Work**

28. The Statement of Work between Z & A and CSC/Altice provides:

> **4. Term**. The term of this Agreement shall commence on the Effective Date for renewals, or the expiry of the product warranty period, and shall continue for a period of year(s) specified in the relevant purchase order (the "Term"). Thereafter, this Agreement shall be renewed automatically from year to year unless one party notifies the other in writing of its desire to permit the Agreement to expire at the expiration of the then current term at least 60 days in advance of an annual renewal date.

29. The term specified in the Purchase Order and Statement of Work was through December 31, 2025. Accordingly, Altice USA was contractually required to notify Z & A in writing of its desire to terminate the Statement of Work no later than sixty (60) days prior to December 31, 2025, i.e., October 31, 2025. Absent such written notification, the Statement of Work automatically renewed for the next twelve months of 2026.

30. Z & A repeatedly advised Altice USA in writing that the Statement of Work would auto-renew unless terminated in writing by October 31, 2025. Nevertheless, Altice USA did not terminate the Statement of Work by October 31, 2025.

31. During the engagement, Altice USA executives acknowledged that the Statement of Work constituted a binding contract. On December 14, 2023 Senior Altice VP Danny Holton requested that Z & A provide a copy of the Statement of Work so Altice/Danny Holton could authorize payments to Z & A. On the same date, Z & A forwarded to Danny Holton the Statement of Work and Purchase Order, which Holton acknowledged and promptly made the required payments to Z & A.

32. Because the Statement of Work was not terminated, on or about December 9, 2025 Z & A sent an invoice to Altice for maintenance services to be provided for 2026, using the same Purchase Order previously issued to define the scope of the services.

**Defendants' Breach**

33. Rather than pay the Invoice, by email dated December 31, 2025, Lynn Liu ("Liu"), VP Technology/Procurement for Altice USA, notified Zen & Art that Altice was "exploring renewal options" and "have not decided to renew both Aceyus and Upstream Works through Z & A yet." By email dated December 30, 2025 Sandesh Shetty of Z & A remined Ms. Liu that " . . . as per the contract, there is an automatic renewal option if not terminated in advance."

34. In response, by email dated December 31, 2025, Liu denied that there was any agreement between the parties and demanded to see a "signed document" outlining the terms for Aceyus and Upstream Works maintenance and support.

35. Further, Liu stated that Altice "would not be renewing Maintenance and Support for Upstream Works through Z & A for 2026." Liu also stated that Altice intended to replace Z &

A and "switch to another Value-Added Reseller (VAR) with the technical expertise required for Upstream Works' products and services." Liu further stated that "Based on our experience over the past few years, we believe Z & A cannot provide the necessary technical value-added, guidance and input into the OEM products and services."

36. Liu demanded that, with respect to the Aceyus component of the Statement of Work, Z & A would have to submit a "renewal proposal" for Altice to further utilize Z & A.

37. Liu's statements were inaccurate and a pretext for attempting to improperly terminate the Statement of Work with Z & A. By email dated January 5, 2026, Sandesh Shetty reminded Liu that a Purchase Order was generated by Altice based on the March 1, 2023 Statement of Work, which together set forth the material terms of the parties' agreement. Ms. Liu's request for a "signed document" therefore ignored the fact that there was already a binding agreement in place, that automatically renewed and had not been terminated.

38. Liu's comments with respect to Z & A's technical expertise vis a vis maintenance and support for Upstream Works were similarly made in bad faith and without basis. As explained in Sandesh Shetty's January 5 email, for the duration of the term of the Statement of Work (i.e., 3 years), Altice had no issues with Z & A's performance. Directly contrary to Liu's comments, Z & A fully and competently performed its duties as required in the Statement of Work and there is no written documentation from Altice suggesting otherwise.

39. By email dated January 5, 2025 Liu claimed that the Purchase Order Altice previously issued was "no longer valid" and expired as of December 31, 2025, and that auto-renewals were "not valid" under Altice's policy unless expressly stated in a signed contract. Ms. Liu continued to insist that no "signed contract" existed between the parties.

40. John Rollo, Altice USA's Director of Operations, and Danny Holton, Altice SVP – Telecom OSS/BSS and Application Development, who had direct knowledge of the existence of

a binding contract with Z & A, were copied on Liu's emails yet made no comment about the clear inaccuracy of her statement.

41. At no point did the parties ever agree orally or in writing that the auto-renewal provisions of the Statement of Work were modified or no longer applied.

42. As a further bad faith pre-text for not honoring the Statement of Work, Liu also implied in her January 5, 2025 email that Z & A had not properly paid Aceyus for the period May 1, 2025 – December 31, 2025, even though Altice had paid Z & A for the same period. Ms. Liu also implied that Aceyus did not provide services to Altice through December 2025 and demanded "proof" that Z & A had made the required payments to Aceyus.

43. In response, Z & A provided proof that Aceyus worked through December 2025 and that Z & A made all payments it was required to make. Liu's insinuations were false and, subject to further discovery and amendment of this pleading, may well be found to constitute trade disparagement to the extent such statements were communicated to third parties.

44. On December 31, 2025, Liu informed Z & A that Altice would not be renewing Maintenance and Support through Z & A for 2026 and would be switching to another VAR. Instead of continuing to utilize Z & A pursuant to the binding Statement of Work, Altice circumvented Z & A and negotiated directly with another VAR and pressured Upstream Works and Aceyus to work directly with Altice and not through Z & A to perform maintenance services through at least 2026, and likely longer.

**B. The Salesforce Project**

45. In or about January 2022, Altice USA requested that Z & A submit a Statement of Work to recommend and implement improvements to modernize the Salesforce.com technical architecture and IT set up within Altice, hereinafter, the "Salesforce Project." Altice requested that the Statement of Work outline a Discovery Phase of the project to determine the scope of work

necessary, including key milestones, methodology and deliverables. Altice further requested that the Statement of Work set forth an Implementation Plan based on the roadmap developed by Z & A during the Discovery Phase.

46. On April 8, 2022, Z & A, submitted a revised Statement of Work for the Discovery and Implementation Phases of the Salesforce Project, together with staffing requirements, deliverables, pricing and estimated timing.

47. Although the revised Statement of Work contained estimates of the duration of the contract, the Statement of Work was not a time and materials contract requiring that the work be completed on an agreed date and the work conceivably could have been performed in less than a year depending on Z & A's allocation of resources.

48. On April 26, 2022 Altice asked that the Statement of Work be bifurcated and that Z & A submit a Statement of Work for Phase I Discovery and a second Statement of Work for the Implementation Phase. Although the Discovery and Implementation phases were to be divided into separate Statements of Work, Altice assured Z & A that it would be utilized for both phases of the Salesforce Project. In an email to Z & A dated April 26, 2022, Roberto Martinez of Altice stated "To be clear, this is only to keep your team operational while we solve internally the development phase discrepancies. We fully intend, to proceed with phase 2 of the project."

49. In accordance with Altice's request, on April 28, 2022 Z & A submitted to Altice USA a revised Statement of Work for the Discovery Phase of the Salesforce Project, titled "Sales Force CRM Project – Discovery Phase Statement of Work (SOW)." Brent Nielson, on behalf of Altice USA, approved the Statement of Work on April 29 and issued Purchase Order ZX976725 with the Statement of Work attached. The Purchase Order for $352,000.00 was acknowledged and accepted by Belinda Loughlin on behalf of Altice USA. Z & A performed the Discovery Phase to

the satisfaction of Altice through December 2022, and Z & A was paid in accordance with the Statement of Work.

50. On or about March 17, 2023 Z & A submitted a Statement of Work to Altice USA for the Implementation Phase of the project based on the previous discovery work conducted by Z & A, titled "Sales Force B2B CRM Implementation Phase Project Statement of Work - SOW #1." The Statement of Work contained the material terms previously agreed by the parties, including the services to be rendered by Z & A and the price. Z & A also sent to Altice USA a Contract for Services dated March 17, 2023 containing the terms previously agreed by the parties for the Implementation services set forth therein, including the $2,635,000 price (with a "do not exceed" cap of $3,000,000) .

51. On or about March 27, 2023 Dave Koster, Project Manager for Altice, submitted Zen & Art's Contract for Services fand Statement of Work for managing Phase Two of the Salesforce Project to Brent Nielson, Altice Procurement.

52. On April 6, 2023 Brent Nielson emailed Z & A indicating that the Salesforce Project was "in process" and that Altice expected to contact Z & A "early next week."

53. On April 17, 2023 Z & A emailed Brent Nielson to request a tentative start date for the team already assembled by Z & A to implement the Salesforce Project. On the same date, Brent Nielson directed Z & A to coordinate the project start dates "with each of the BU [Business Unit] stakeholders."

54. On April 24, 2023, Brent Nielson emailed Z & A confirming that he redlined the Statement of Work for Services for the Implementation of the Salesforce Project and was awaiting comments from Dave Koster, the Project Manager. Altice's review was intended solely to update the Statement of Work, not to change any of the material terms already agreed by the parties.

Nielson wrote that, "once we have the updated draft, we'll send it to you and then get on a call to try to quickly finalize."

55. On or about May 9, 2023 Dave Koster informed Z & A that he had no redline changes to the Statement of Work. Z & A requested a call to agree on a schedule to commence implementation of the Salesforce Project. It was understood by the parties that all material terms of the Statement of Work had been agreed and the only remaining task was the formality of executing the Contract for Services and choosing a start date.

56. Upon information and belief, it was standard practice for companies such as Altice to use the same company that performed the Discovery Phase of engagements to also carry out the Implementation Phases for the same projects.

57. On or about May 11, 2023, Brent Nielson of Altice advised Z & A that the final Statement of Work was ready.

58. In reliance on Altice's assurance that it intended to go forward with the implementation of the Salesforce Project, Z & A kept its team operational and engaged and ready to perform the agreed services, resulting in an inability to utilize such team members for other projects. Z & A also diverted resources and turned away other business it could have pursued but for Altice's commitments to use Z & A to Implement the Salesforce Project, in accordance with the discovery work already performed by Z & A.

59. In anticipation of Z & A commencing work on the Salesforce Project, the Altice executive team requested in or about February 2023 that Z & A perform significant additional services, for which Z & A was never compensated. That work included examining Altice's proposed licensing contract with a Salesforce acquisition company, MuleSoft, to determine whether MuleSoft's estimates of the number of interfaces needed by Altice was accurate. Z & A's

examination of Altice's salesforce environment and downsizing of MuleSoft's estimates saved Altice approximately $1 million per year in licensing fees.

60. After the Altice scandal broke in July 2023, Altice initiated a campaign to salvage its reputation by, among other things, distancing itself from vendors it previously worked with, including vendors such as Z & A which was in no way involved with the fraudulent rigging process being investigated by the authorities. Without any justification or notice, Altice refused to circulate the final agreement to implement the Salesforce Project for signature or utilize Z & A for the services set forth therein.

**C. Project Maui Contract**

61. In or about December 2021, Altice USA introduced Z & A to Winprovit. Although at the time Z & A was unaware of the precise relationship between Altice and Winprovit, Winprovit worked almost exclusively for Altice and at the time had over 1,500 people deployed to service Altice's operations.

62. At or about the same time, Z & A was also introduced to Pedro Caravana ("Caravana"), a consultant who acted as an agent for both Winprovit and Altice. Caravana also reportedly managed the equity holdings of Portuguese businessman Hernani Vaz Antunes, a founder and executive of Winprovit. Antunes was alleged to have conspired with Altice in connection with the procurement scandal that erupted in August 2023.

63. Beginning in late December, 2021, Caravana began discussing with Sandesh Shetty and others at Z & A, a potential lucrative contract for Z & A to outsource hundreds of resources to India to work on a service desk/call center and other managed sources for Altice employees (the "Managed Services Contract.").

64. From December 2021 through January 2022 Caravana emailed extensive information about an Altice call center and service desk to enable Z & A to formulate staffing rates and a

proposed bid. On or about January 27, 2022 Z & A sent Caravana a final price quote to relay to Altice. The fact that Caravana was sending Z & A Altice's proprietary information about the Managed Services Contract, negotiating terms on Altice's behalf, and relaying contract terms and counter-proposals from Altice, demonstrated that Caravana was acting as an agent of Altice, and that Altice authorized or consented to Caravana's agency.

65. While Altice's decision was pending, on or about February 3, 2022 Caravana, on behalf of Altice, approached Z & A about providing resources (including temporary workers based overseas) to CSC Holdings, LLC/Altice. The two-year engagement, named "Project Maui," involved Z & A working with Winprovit to develop new web services for Altice's consumer facing applications like optimum.net. Unlike Z & A, Winprovit was neither an approved Altice vendor nor licensed to perform services in the United States.

66. Caravana represented to Sandesh Shetty of Z &A, that if Z & A entered into Work Orders for Project Maui under terms to be dictated by Altice, Altice USA would award Z & A the Managed Services Contract. Such a contract would have been worth $5,560,000 million annually for a total of three (3) years.

67. Caravana's promises to Z & A were made at the behest of Altice USA to induce Z & A to agree to perform services for Project Maui under highly disadvantageous terms. In fact, Altice had a preconceived and undisclosed intention not to award Z & A the Managed Services Contract to, among other things, outsource 600 contractors and other workers to India.

68. In reliance on Caravana's promise, Z & A verbally agreed to work on Project Maui on terms to be dictated by Altice USA.

69. On or about February 11, 2022 Caravana confirmed in a telephone conversation with Sandesh Shetty of Z & A that there was a "deal" for Z & A to offshore 270+ people to India.

Caravana, who was speaking as an agent of Altice USA, stated that it would likely be a six-year deal and would be finalized in the coming months.

70. While the Managed Services Contract was purportedly being finalized, Caravana forwarded Sandesh Shetty of Z & A two Work Orders setting forth the terms for Project Maui. One Work Order, WO/2022/01, was an agreement between Z & A and CSC Holdings, Inc. (further defined in the Work Order as "Altice") which set forth the services and resources to be provided by Z & A and provided for monthly payments of $152,105.00.

71. The second Work Order, WO/2022/01, was an agreement between Z & A and Winprovit, which set forth the services and resources to be provided by Winprovit, and payments of $1,419,216.00 over two years to be made by Z & A to Winprovit. Accordingly, Winprovit was to act as Z & A's subcontractor on Project Maui.

72. Caravana dictated the terms of both Work Orders including the overall price to be paid by Altice to Z & A, the price to be paid by Z & A to Winprovit, the resources to be provided to Altice by each company, and the margins to be paid to Winprovit on Z & A employees deployed to the project.

73. The contract terms were highly disadvantageous to Z & A. Among other things, the Work Order with Winprovit required Z & A to pay Winprovit excessive margins on Z & A's employees deployed to the project (termed "project management fees"), even though Winprovit was to deploy only three (3) employees to the project. The Work Order with Winprovit and attached Excel Spreadsheet drafted by Caravana, provided that Winprovit would receive $10.00/hr on each hour billed by the ten (10) employees Z & A deployed to the project.

74. As a result, the Z & A would operate with a negative profit margin, i.e., zero fees, whereas Winprovit would charge "management fees" and take a percentage of Z & A's contract with Altice for doing next to nothing.

75. The Work Orders were presented by Carvana to Z & A as non-negotiable. Caravana simultaneously submitted the Winprovit/Z & A Work Order to Winprovit and the Altice/Z & A Work Order to Altice for approval and signature. CSC Holdings, LLC (defined in the Work Order as “Altice) and Winprovit accepted the Work Orders without negotiation, comments or changes, which further demonstrates (a) that Altice and Winprovit collaborated in advance on the terms of the Work Orders; (b) Altice consented to the agency and authority of Caravana to present the Work Orders to Z & A for execution; and (c) Altice exercised control over Caravana as its agent.

76. Based on the procurement scandal involving allegations of collusion between Altice and Winprovit first reported in August 2023, the structure of the Work Orders, and the excessively high margins paid to Winprovit were highly suspect in retrospect.

77. Nevertheless, based on the promises made by Caravana regarding the award of the Managed Services Contract, Z & A executed the Work Order with CSC Holdings/Altice in May 2022 and CSC Holdings executed the Work Order on May 12, 2022. Z & A executed the Work Order with Winprovit on May 13, 2022 and Winprovit executed it on or about May 6, 2022.

78. The only reason Z & A agreed to give up its margins on the resources deployed for the Project Maui Work Orders, and to pay Winprovit “project management fees” for services it did not provide, was Altice USA’s promise to reward Z & A with the Managed Services Contract to, among other things, offshore at least 270 persons to India.

79. On or about June 8, August 10 and September 12 2022, Caravana continued to assure Sandesh Shetty that the Managed Services Contract between Z & A and Altice was being finalized. Caravana also represented that Altice planned to also use Z & A to outsource staffing to Brazil.

80. Z & A performed the services required under the Project Maui Work Order with Altice and provided significant value to Altice for which Z & A was never compensated.

81. Z & A suffered significant losses because of performing the Project Maui Work Order.

82. Altice USA never awarded Z & A the Managed Services Contract to, among other things, outsource resources to India, and had no intention of awarding Z & A that contract at the time the promise was made by Caravana.

83. Instead of awarding the Managed Services Contract to Z & A, Altice awarded the contract to a company newly organized in New York in or about December 2022, World IT Consulting Inc. ("World IT"). World IT was essentially a shell company with no operating history, composed principally of Winprovit employees, who alternated between acting as representatives of World IT and Winprovit. The sole contact and email address for World IT was Pedro Caravana, who had acted as an agent for both Winprovit and CSC Holdings/Altice to induce Z & A to enter into the Project Maui Work Orders.

**FIRST CAUSE OF ACTION**

**(Breach of the CISCO Contract)**

84. Plaintiff hereby incorporates by reference each paragraph above as though set forth fully herein.

85. On or about April 6, 2023 Z & A and CSC Holdings (defined in the Statement of Work as "Altice USA"), entered into a binding contract consisting of a Statement of Work dated January 27, 2023, a Purchase Order issued March 30, 2023, and emails and other objective manifestations of the parties' intent. The writings together establish an offer, acceptance of the offer, consideration, and a mutual intent to be bound.

86. The Statement of Work and Purchase Order set forth the terms and conditions under which Z & A would provide certain network licensing and support services to Altice from January 2024 through December 2025, with staged payments to be made to Z & A totaling $6,014, 816.08.

87. Plaintiff performed the services required under the Statement of Work and Purchase Order.

88. The Statement of Work provided that:

> 4. Term. The term of this Agreement shall commence on the Effective Date for renewals, or the expiry of the product warranty period, and shall continue for a period of year(s) specified in the relevant purchase order (the "Term"). Thereafter, this Agreement shall be renewed automatically from year to year unless one party notifies the other in writing of its desire to permit the Agreement to expire at the expiration of the then current term at least 60 days in advance of an annual renewal date.

89. Accordingly, Section 4 of the Statement of Work required Defendants to notify Z & A in writing no later than sixty (60) days prior to December 31, 2025, (i.e., October 31, 2025) in the event it wanted to terminate the Statement of Work. Absent such written notification, the Statement of Work automatically renewed for the next twelve months of 2026.

90. Defendants failed to terminate the Statement of Work in accordance with its terms and, accordingly, it was automatically renewed for another year, under the same terms.

91. Defendants never terminated the Statement of Work or the Master Service Agreement.

92. Defendants breached the Statement of Work by failing to utilize the services of Z & A or to pay the required remuneration under the CISCO Contract for 2026.

93. Defendants improperly contracted with another Value-Added Reseller and/or negotiated directly with Aceyus and Upstreamworks to perform the services for which Defendants and Z & A contracted, thereby improperly circumventing and breaching the Statement of Work.

94. As a direct and proximate result of Defendants' breach, Z & A suffered damages, in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**

**(Tortious Interference with Economic Relations)**

95. Plaintiff hereby incorporates by reference every paragraph above as though set forth fully herein.

96. Z & A had an existing business relationship with the OEMS Aceyus and Upstreamworks and other subcontractors it was using on the Cisco Contract and had reasonable expectations that those business relationships would continue for that project, and other projects.

97. Defendants were aware of such business relationships and nevertheless intentionally interfered with them.

98. Defendants used improper means to interfere with Z & A's relationships, including exercising economic coercion, using misrepresentations, and disparaging Z & A. Defendants intentionally interfered with malicious intent to harm Z & A's business and circumvent Z & A's business relationships with its subcontractors.

99. But for Defendants' actions, Z & A's business relations with its subcontractors would have continued.

100. As a result of Defendants' breach, Z & A has suffered, and will continue to suffer, damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

## (Breach of Written Contract for Salesforce Project)

101. Plaintiff hereby incorporates by reference every paragraph above as though set forth fully herein.

102. Altice and Z & A agreed on the material terms of a contract to determine the scope of work (i.e., the Discovery Phase") and implementation (the "Implementation Phase") of a project to modernize Altice's Salesforce technology environment.

103. At the direction of Altice, Z & A combined the Discovery Phase and the Implementation Phase in a single Statement of Work, the material terms of which were agreed to by the parties.

104. Altice subsequently requested that Z & A divide the Discovery and Implementation aspects of the Project in separate Statements of Work. Accordingly, Z & A submitted a Statement of Work for the Discovery Phase which was executed by Altice and Z & A.

105. Z & A fully performed the Statement of Work for the Discovery Phase and was paid by Altice.

106. As requested by Altice, Z & A subsequently delivered the Implementation Phase in a separate Statement of Work. Altice agreed to all the terms of the Statement of Work except for de minimis and non-material changes and stated that the final agreement would be circulated for signature.

107. Altice represented in various communications, written and oral, that it requested the bifurcation of the agreements solely to work out what Roberto Martinez of Altice USA referred to in an April 26, 2022 email as internal "development phase discrepancies." However, Altice represented that it fully intended to use Z & A for the Implementation Phase and requested that Z & A keep its team operational until the final Statement of Work could be circulated for signature.

108. The parties had agreed to all the material terms of the Statement of Work for the Implementation Phase, there were no further terms to negotiate, and the execution of the agreement was considered a mere formality.

109. The draft Statement of Work for the Implementation Phase, together with other writings and emails of the parties detailed herein, as well as documents that may be obtained in discovery, constitute a written contract for the performance of the Implementation Phase of the Salesforce Project.

110. Altice breached the Statement of Work for the Implementation Phase by failing to utilize Z & A pursuant to the terms of the Statement of Work and Contract for Services reviewed and approved by Altice.

111. As a result of Defendants' breach, Z & A has suffered damages, in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### (Breach of Oral Salesforce Project Contract)

112. Plaintiff hereby incorporates by reference each and every paragraph above as though set forth fully herein.

113. In the alternative, if a written contract is not enforceable, the parties orally agreed to all the material terms of the Statement of Work for the Implementation Phase, and there were no further material terms to negotiate.

114. Roberto Martinez and Brent Nielson of Altice orally and in writing promised that Altice fully intended to utilize Z & A for the Implementation Phase of the Salesforce Project and urged Z & A to keep its team "operational" while a formal written contract was circulated for

signature. The parties discussed and agreed on all the material terms of the contract, which were set forth in the Statement of Work and Contract for Services submitted by Z & A to Altice.

115. Although the parties discussed estimates of the duration of the contract that exceeded one year, the contract for the Salesforce Project was not a time and materials contract and conceivably could have been performed in less than a year.

116. Altice breached the oral contract by failing to go forward with the project utilizing Z & A pursuant to the terms of the oral agreement with Z & A.

117. As a result of Defendants' breach, Z & A suffered damages, in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**

**(Promissory Estoppel – Salesforce Project)**

118. Altice made clear and unambiguous promises that Altice would use Z & A for the Implementation Phase of the Salesforce Project, and that Z & A should keep its team operational until Altice could circulate the final Statement of Work for signatures.

119. In reliance on Altice's assurance that it intended to go forward with the implementation of the Salesforce Project, Z & A kept its team operational and engaged and were ready to perform the agreed services, resulting in an inability to utilize such team members for other projects. Z & A also diverted resources and turned away other business it could have pursued but for Altice's commitments to use Z & A to implement the Salesforce.com project.

120. In anticipation of Z & A commencing work on the implementation of the Salesforce Project, Altice's executive team requested in or about February 2023 that Z & A perform significant additional services, for which Z & A was never compensated. That work

included examining Altice's proposed licensing contract with a Salesforce acquisition company, MuleSoft.

121. Z & A's examination of Altice's Salesforce technology environment and downsizing of MuleSoft's estimates saved Altice approximately $1 million per year in licensing fees.

122. Z & A's reliance on Altice's promises was both reasonable and foreseeable.

123. Z & A suffered damages and prejudicial change in position due to its reliance on Defendants' promise.

**SIXTH CAUSE OF ACTION**

**(Fraudulent Inducement – Project Maui)**

124. Plaintiff hereby incorporates by reference every paragraph above as though set forth fully herein.

125. Altice and CSC Holdings, through their agent Caravana, made false representations of material fact that Z & A would receive a lucrative contract to outsource 270+ persons to India to work on a Managed Services Contract to induce Z & A to execute Work Orders for Project Maui at a significant loss.

126. Altice and CSC Holdings knew the representations were false when making them and had no intention of awarding Z & A the Managed Services Contract to outsource resources to India.

127. Altice and CSC Holdings intended for Z & A to rely on the false statements.

128. Z & A's reliance on Altice and CSC Holdings' promises was justifiable, reasonable, expected and foreseeable.

129. Z & A suffered significant damages due to its reliance on Altice and CSC Holdings's false statements, in an amount to be proved at trial.

**WHEREFORE**, Plaintiff Z & A demands judgement against Defendants for the following:

1. Judgement on the First, Second, Third, Fourth, Fifth and Sixth Causes of Action;
2. Interest, attorneys' fees and costs; and
3. Such other and further relief as the Court deems just and proper.

Dated: October 27, 2026

Respectfully submitted,

KOSTYN BLINKEN, LLP

By: */s/ Kevin F. Kostyn, Esq.*
KK1345

kk@kostynblinken.com
647 East 9th Street Suite 3
New York, New York 10009
212-254-2677
*Attorneys for Plaintiff*